140 N.J. Super. 185 (1976)
356 A.2d 1
LEONARD PARKER, COMPLAINANT-RESPONDENT AND CROSS-APPELLANT,
v.
CHRIS DORNBIERER AND MARGARET DORNBIERER, RESPONDENTS-APPELLANTS AND CROSS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 1975.
Decided January 22, 1976.
*186 Before Judges MATTHEWS, LORA and MORGAN.
Mr. Francis J. Beyrent argued the cause for appellants and cross-respondents (Messrs. Schenck, Price, Smith & King, attorneys; Mr. Ben D. White, of counsel).
Mr. Joseph H. Indick argued the cause for respondent and cross-appellant (Messrs. Barshay, Indick and Malanga, attorneys).
Ms. Judith S. Musicant, Deputy Attorney General, argued the cause for the Division on Civil Rights (Mr. William F. Hyland, Attorney General, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
PER CURIAM.
Chris and Margaret Dornbierer (Dornbierers) appeal from the findings, determination and order made by the Director of the Division on Civil Rights following the submission of recommended findings of fact and conclusions of law by a hearing examiner. It was the decision of the Division that the Dornbierers refused to complete an undertaking entered into, but not completed with a binding contract, for the sale of certain real estate and a *187 business owned by them and located and conducted in East Hanover, New Jersey, because the putative purchaser, complainant Parker, employed Puerto Ricans in connection with the operation of his business.
The action was instituted by Parker, who filed a complaint alleging that the Dornbierers refused to sell him their greenhouse business located in East Hanover, Morris County, because he (Parker) employed and housed Puerto Ricans in his own greenhouse business in Scotch Plains, Union County. The Dornbierers, in answer, contended that the actual reason for their refusal to sell to Parker was that they had heard a number of "bad things" concerning Parker's business practices and reputation.
The Dornbierers' business and property consisted of land, a house and greenhouses used in conjunction with the raising of live plants in an agricultural business. The Dornbierers had advertised in a trade publication that the land, buildings and business were for sale. As a result of the ad Parker visited the Dornbierers sometime during the early part of June 1974 at the premises in question. The purpose of his visit was to inspect the property and discuss the possibility of the purchase of the same.
There followed a series of visits by Parker to the premises offered for sale, and discussions between Parker and the Dornbierers which ultimately ripened to the point where there was a general meeting of the minds between the parties as to a sales price for the real estate and a formula for the purchase of the inventory to be transferred. This understanding was subsequently put into a writing shortly after a last meeting between Parker and the Dornbierers. That writing, at the advice of a realtor who was a friend of the Dornbierers, was made subject to approval of the Dornbierers' attorney. While a formal contract was in the process of preparation between the attorneys for the parties, the Dornbierers notified Parker through his attorney that the negotiations for the sale were terminated. Why the sale was terminated became a *188 question of dispute and the subject matter of the hearing before the Division on Civil Rights.
It was the contention and testimony of Parker that the Dornbierers refused to sell their business and property to Parker because Parker employed Puerto Ricans at his premises in Scotch Plains, and if he should employ Puerto Ricans in East Hanover, that fact would cause difficulties with the neighbors.
On the other hand, the Dornbierers contended that they did not desire to consummate the transaction with Parker because they subsequently found out that he had been accused of sharp practices in the trade and was unreliable as a result. They offered to prove that litigation in South Jersey established those facts. In addition, the Dornbierers testified that they themselves had employed Puerto Ricans and, in fact, that their Puerto Rican laborers dine with them at their dining room table on many occasions.
There were several additional witnesses produced for both sides whose testimony was for the purpose of buttressing the circumstances alleged by each with respect to discrimination or nondiscrimination. It would serve no purpose for us to repeat the same in this opinion.
As noted above, the hearing examiner found that the Dornbierers had unlawfully discriminated against Parker within the meaning of N.J.S.A. 10:5-12(a) (d) and (g). We find the record totally unsupportable of the hearing examiner's conclusions which were adopted by the director.
We are mindful that the standard of judicial review of factual determination made by an administrative agency is rather narrow, i.e., whether the findings could reasonably have been reached on sufficient credible evidence present in the record considering the proofs as a whole and with due regard to the opportunity of the one who heard the witnesses to judge their credibility. See, e.g., Jackson v. Concord Co., 54 N.J. 113, 117-118 (1969). The hearing examiner, apparently, based her determination on the acceptance of *189 Parker's testimony as to what Dornbierer said to him. However, in reaching that determination she observed that the testimony was clear that both Mr. and Mrs. Dornbierer were "good, moral and religious persons, who in their own lives are not discriminatory or prejudicial and it further showed that on the contrary they were affirmative in matters combating such discrimination." (Emphasis supplied) Then she added: "However, the intent to discriminate is not required. If the conduct has a discriminatory effect, it is unlawful discrimination even if there is no express proof of intent to discriminate." Considering these findings, we find it difficult to see how the hearing examiner could have found that the Dornbierers discriminated against Parker, and thus, indirectly against Puerto Ricans as a class. The act of discrimination requires intent since it in itself is a mental process under which one willingly chooses one or another of alternatives. Of course, we recognize that discrimination is not usually practiced openly and that intent must be found by examining what was done and what was said in the circumstances of an entire transaction. The hearing examiner here found no intent to discriminate on the part of the Dornbierers. Apparently, she concluded that because Parker said the Dornbierers were afraid that Puerto Ricans would come into East Hanover, that in itself indicated discrimination on the part of the Dornbierers. But that determination raises several questions: Why, for example, did the Dornbierers even negotiate with Parker if they knew that Parker had employed Puerto Ricans in Scotch Plains? Why did the Dornbierers have any concern as to whether or not Parker would bring Puerto Ricans into the area since the Dornbierers were going to move away anyway?
Against this naked evidence of a refusal to sell for the reasons testified to by Parker and a finding of a lack of intent to discriminate on the part of the Dornbierers, there is ample testimony in the record to support the contention of the Dornbierers that they refused to sell to Parker because *190 of his questionable business practices and because they were afraid that Parker might not in the future be able to meet the unsecured obligations which would be part of the financial considerations of the sale. In addition, as we have noted, the hearing examiner clearly pointed out that the Dornbierers were law-abiding, religiously-oriented people who not only did not discriminate against anyone for race, religion or origin in their private lives, but also took affirmative steps to combat discrimination. In light of these findings, we fail to see how the hearing examiner could reach the conclusion that she did on the record before her, and how the director could have accepted her findings and conclusions.
In view of our determination of the substantive issues raised in this appeal, we find it unnecessary to pass upon the question of the status of Parker to maintain this action before the Division on Civil Rights.
The determination and order of the Division on Civil Rights are reversed.